UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

ILLINOIS ONE NEWS, INC.
d/b/a THE GIFT SPOT,

        Plaintiff,

    v.

CITY OF MARSHALL, ILLINOIS ,

        Defendant.

Case No. 04-cv-4055-JPG

**FINDINGS OF FACT AND
CONCLUSIONS OF LAW**

This is an action under 42 U.S.C. § 1983 for declaratory and injunctive relief to prevent the defendant City of Marshall, Illinois ("Marshall") from enforcing its zoning ordinance. Plaintiff Illinois One News, Inc. d/b/a The Gift Spot ("ION" or "The Gift Spot"), a purveyor of sexually explicit materials, alleges that Marshall will violate its free speech rights under the First Amendment and its due process rights under the Fourteenth Amendment by enforcing that ordinance. Specifically, ION alleges that Marshall's ordinance (1) is directed at suppressing protected speech and is not a reasonable time, place and manner restriction directed at reducing secondary effects, (2) is unconstitutionally vague and overbroad and (3) contains a site plan review process that amounts to an unlawful prior restraint on speech.

The Court consolidated the proceedings involving ION's motion for a preliminary injunction and the trial on the merits, and conducted a two-day bench trial in Benton, Illinois, on September 6 and 7, 2005. ION was represented by Roger B. Webber and Brett N. Olmstead, and Marshall was represented by Ronald S. Cope, Jamie A. Robinson and Laurel A. Haskell. ION called Stacy Slowiak, Owen Makoroff and Bruce C. McLaughlin as witnesses in its case in chief, and called McLaughlin as a rebuttal witness. Marshall called John Trefz, John Welborn, Steve

Calhoun, Robert Morris and Leslie S. Pollack in its case in chief.

Pursuant to Federal Rule of Civil Procedure 52, the Court makes the following findings of fact and conclusions of law:

## I.  FINDINGS OF FACT

The stipulations and the evidence at trial establish the following relevant facts:

The Ordinance[1]

1.     The Preamble of the Ordinance states, in pertinent part:

> AN ORDINANCE to regulate the use of land, natural resources and structures; to regulate structures designed for trade, industry, residence or other specified uses; to regulate and limit the height, the area, the size and location of structures hereinafter to be erected or altered; to regulate and determine the yards, court or other open spaces; to control congestion in the streets, to secure safety in case of fire, to prevent the overcrowding of land, to bring about the gradual conformity of the uses of land and buildings and for such purposes to divide the city into districts and zones, to establish appeal procedures; to provide for the administration and enforcement of the provisions of this ordinance and to prescribe penalties for the violation thereof.

> * * *

> Specific Findings Concerning Adult Uses

> WHEREAS, at the request of the City of Marshall, Robert Morris, AICP, of Champaign County Regional Planning Commission conducted research on the adverse impacts due to an existing Adult Use ("adult book store") in the City and the development of standards for mitigating the adverse impacts from Adult Uses under the City's zoning ordinance; and
> WHEREAS, Robert Morris has presented the results of his investigation to the Plan Commission; and
> WHEREAS, upon review of the Minnesota Attorney General's Report entitled "Report of the Attorney General's Working Group on the Regulation of Sexually Oriented Business," which includes summaries of studies in

---

[1]Unless otherwise specified, further reference to the "Ordinance" will refer to the current version of Marshall's zoning ordinance, that is, Ordinance No. 2002-O-16, Zoning No. 2002-Z-2, as amended by Ordinance No. 2005-O-16, Zoning No. 2005-Z-4.

Minneapolis, St. Paul, Indianapolis, Phoenix and Los Angeles  regarding the impact of sexually oriented businesses on the community, as well as being informed of the findings of similar studies in other communities, the corporate authorities of the City of Marshall find that sexually oriented businesses are associated with:

    (1)   high crime rate areas;

    (2)   deteriorated commercial and residential areas;

    (3)   depreciation of property values in the area;

    (4)   dramatic changes in the character of the neighborhood when more than one sexually oriented business is operating in a given area; and

    (5)   Sales tax revenues are extremely important to the economic well-being of the City of Marshall.  Persons who use the regional shopping areas within the City of Marshall will shop elsewhere if these shopping areas are identified with adult uses; and

WHEREAS, the intent of the adult use regulations is to protect the public health, safety and welfare by limiting the deleterious effects of sexually oriented businesses on the use and enjoyment of property in adjacent areas and to protect the property tax and sales tax base of the City; and

WHEREAS, the City recognizes that the First Amendment to the United States Constitution requires that the City of Marshall "refrain from effectively denying" expressive adult use operations a reasonable opportunity to open and operate within the City.  Adult use regulations are meant as a narrow means to eliminate, or at least limit, the deleterious effects of adult uses on the health, safety and welfare of the residents, business owners and property owners in the City of Marshall.  The Adult use regulations leave approximately 256.75 acres available for adult uses constituting approximately 11.66% of the entire City of Marshall and 46.16% of industrial areas in said territory; and

WHEREAS, the Adult use regulations limiting the areas available for adult uses have been narrowly drafted to separate adult uses from residential areas and from each other.  Further, the regulations have been drafted to keep such uses from defining the character of the commercial areas within the City of Marshall. It is the intent of the corporate authorities that these regulations be as strict as constitutionally permissible and that they shall be severable, where necessary, to insure their constitutionality[.]

2.    The first paragraph of the Ordinance sets forth its purpose as:

"promoting and protecting the public health, safety, peace, comforts, convenience and general welfare of the inhabitants of the City of Marshall by protecting and conserving the character and social and economic stability of the residential, commercial, industrial, and other use areas, by securing the most appropriate use of land; preventing over-crowding; and facilitating adequate and economical provision of transportation, water, sewers, schools, recreation, and other public requirements."

3.     Article II, § 1 of the Ordinance provides the following definitions:

(3)     *Adult bookstore*:  An establishment having as a substantial or significant portion of its sales or stock in trade, books, magazines, films for sale or for viewing on premises by use of motion picture devices or by coin operated means, and periodicals which are distinguished or characterized by their emphasis on matter depicting, describing or relating to "specified sexual activities," or "specified anatomical areas;" or an establishment that holds itself out to the public as a purveyors [*sic*] of such materials based upon its signage, advertising, displays, actual sales, presence of video preview or coin operated booths, or exclusion of minors from the established's premises or any other factors showing the establishment's primary purpose is to purvey such material.

* * *

(7)     *Adult use*:  Adult bookstores, adult motion picture theaters, adult entertainment cabarets, adult novelty stores and other similar uses.

* * *

(34)    *Incompatible use*:  The transfer over a property line of negative economic or environmental effects, including but not limited to, traffic, noise, vibration, odor, dust, glare, smoke, pollution, mismatched land uses or density, height or mass, mismatched layout of adjacent uses, loss of privacy, and/or unsightly views.

4.     Article VII, § 8 of the Ordinance states:

Adult Uses are permitted uses in I-1 Light Industrial District and I-2 Heavy Industrial District and subject to the conditions set out below:

1.     Prior to the issuance of any permit for the construction or occupancy of an adult use, the applicant for said permit(s) must first proceed through a site plan review at a public meeting before the zoning commission and city council.

2.     No adult use shall be located within 1,000 feet of any property which is zoned or used for a school, day care center, cemetery, public park, forest preserve, public housing, place of religious worship, other adult use or any property which is zoned B-3 [regional shopping center district].  Said distance shall be measured from the property line of the property upon which the adult use is located or proposed to be located to the property line of the other zoned or used properties described herein.

* * *

4

4.      The zoning commission may recommend and the city council may place conditions on the development and operation of the adult use related to site plan floor plan, construction materials, lighting, parking, and circulation, ingress and egress, landscaping and screening, and signage in order to assure that the design is compatible with surrounding uses and the operation of the adult use is in conformance with all city ordinances.  No adult use shall be conducted in any manner that permits the observation of any material depicting, describing or relating to "specified sexual activities" or "specified anatomical areas", as defined in this zoning ordinance from any public way or from any property not registered as an adult use.  This provision shall apply to any display, decoration, sign, show window or other opening.

5.      Article XV, § 8 of the Ordinance provides businesses that become non-conforming as a result of the Ordinance are entitled to an amortization period of one year if it applies for a certificate of non-conformance and of six months if it does not apply for such a certificate.

6.      Article XVIII-A of the Ordinance states:

**Section 1.  Purpose.**

The site plan review process promotes orderly development and redevelopment in the city, and ensures such development or redevelopment occurs in a manner that is harmonious with surrounding properties, is consistent with the comprehensive plan, and promotes the general welfare of the city.  This section provides standards by which to determine and control the physical layout and design to achieve the following purposes:
(1)    Compatibility of land uses, buildings, and structures.
(2)    Protection and enhancement of community property values.
(3)    Efficient use of land.
(4)    Minimization of traffic, safety hazards, and overcrowding problems.
(5)    Minimization of environmental problems.

**Section 2.  Applicability.**

Certain uses and certain areas designated for more intensive use require additional regulation to protect the public health, safety and welfare.  A site plan review shall be required for every application for a building permit as required by this ordinance as a condition for approval of a use located in [an] . . . I-1 or I-2 zoned district. . . .

5

**Section 3.  Procedure.**

(1)     Applications for site plan review shall be submitted to the zoning officer and forwarded to the zoning commission for review.

(2)     After an application for a site plan review has been submitted to the zoning commission, the zoning commission shall hold a duly advertised public hearing as prescribed by statute and made [*sic*] a recommendation to grant or deny the site plan within sixty (60) days of filing of the complete application.  The zoning commission recommendation must be based on the standards listed in section 4 below and compliance with any additional standards of this ordinance.  In making its recommendation, the zoning commission may also recommend such additional conditions and requirements as are appropriate or necessary to protect the public health, safety, and welfare and to carry out the purpose of this ordinance.

(3)     The city council shall make the decision to grant or deny a site plan within sixty (60) days of receiving the zoning commission recommendation, based on the standards listed in section 4 below and any additional standards of this ordinance.  The city council may impose any conditions or requirements, including but not limited to, those recommended by the zoning commission, which it deems appropriate or necessary in order to accomplish the purpose of the ordinance.  If the city council approves a site plan, a building permit may then be issued, provided that all other requirements of all other applicable city codes and ordinances are satisfied.

**Section 4.  Standards for site plan review.**

The scope of the site plan review includes the location of principal and accessory structures, infrastructure, open space, landscaping, exterior lighting, traffic movement and flow, number of parking spaces, design of parking lots, location of landscaping and screening, and compliance with the provisions of this ordinance.  In reviewing site plans, the relationship of the site plan to adopted land use policies, and the goals and objectives of the comprehensive plan shall be evaluated.  In addition to any other requirements of this ordinance, the following characteristics shall also be considered:

(1)     The arrangement of the structures and building on the site to:

    (a)   Respond to off-site utility and service conditions, and minimize potential impacts on existing or planned municipal services, utilities, and infrastructure.

    (b)   Conform to the requirements of this ordinance and other applicable regulations.

(2)     The arrangement of open space or natural features on the site to:

    (a)   Provide adequate measures to preserve existing healthy, mature trees wherever practically feasible.

    (b)   Break up large expanses of asphalt with plant material.

    (c)   Buffer adjacent incompatible uses.

    (d)   Screen unsightly activities from public view.

     (e)    Create a logical transition to adjoining lots and developments.

     (f)    Avoid unnecessary or unreasonable alterations to existing topography.

     (g)    Minimize the visual impact of the development on adjacent sites and roadways.

     (h)    Provide plant materials and landscaping designs that can withstand the city's climate, and the microclimate on the property.

(3)    The organization of circulation systems to:

     (a)    Provide adequate and safe access to the site.

     (b)    Minimize potentially dangerous traffic movements.

     (c)    Achieve efficient traffic flow in accordance with standards in the "Institute of Traffic Engineers Transportation and Traffic Engineering Handbook."

     (d)    Provide the required number of parking spaces.

     (e)    Separate pedestrian and auto circulation.

     (f)    Minimize curb cuts.

(4)    The design and location of site illumination to minimize adverse impacts on adjacent properties.

(5)    Conformance of the proposed development with the goals and policies of the comprehensive plan and all city codes and regulations.

* * *

**Section 6.  Site Plan Requirements.**

Submission requirements for site plan review shall be as follows:

* * *

     (5)    Any other supporting documents to indicate intentions and/or any other items required by the zoning officer.

7.    Article III, § 1 provides that the Ordinance only applies within Marshall's city limits.

<u>The Parties</u>

8.    Marshall is an Illinois municipality located in Clark County, Illinois, with a population of approximately 3,771 people.

9.    Marshall is a rural community that is located approximately 15 miles from Terre Haute, Indiana.

10.     Clark County does not have any zoning regulations that regulate adult uses at the present time.

11.     ION is an Illinois corporation duly formed and incorporated on September 14, 2001.

12.     Since November 1, 2002, ION has leased the property at 1802 North Illinois, Highway One, in Marshall, from 1002 North Illinois One, L.L.C..

The Passage of the Ordinance

13.     On November 1, 2002, Marshall published notice of a public hearing on the recodification of the Marshall zoning ordinance in the *Marshall Advocate*.  Prior to enacting Ordinance No. 2002-0-16 and Zoning No. 2002-Z-2 ("2002 Ordinance"), Marshall obtained a report authored by Robert Morris ("Morris"), of the Champaign County Regional Planning Commission ("Morris Report").

14.     On November 18, 2002, Marshall's Plan Commission held a public hearing on the 2002 Ordinance, the recodification of Marshall's zoning ordinance ("Plan Commission hearing").

15.     The following exhibits were introduced into evidence at the Plan Commission hearing:

   a.     City Ex. 1 – Report of the Attorney General's Working Group on the Regulation of Sexually Oriented Businesses ("Minnesota Attorney General's Report")

   b.     City Ex. 2 – Report of Robert Morris – 6/27/02

   c.     City Ex. 3 – Proposed Zoning Ordinance 2002-Z-2

   d.     City Ex. 4– Proposed Zoning Ordinance 2002-Z-3

   e.     City Ex. 5– Proposed Zoning Ordinance 2002-Z-4

   f.     City Ex. 6– Affidavit of Service of Notice of Hearing on 1002 North Illinois One,

8

             L.L.C.

g.     City Ex. 7– Affidavit of Service of Notice of Hearing on 1002 North Illinois One,

             L.L.C.

h.     City Ex. 8 - Affidavit of service of Notice of Hearing on Communications Sites of

             America, Inc.

i.      City Ex. 9– Strohm Newspapers, Inc.'s Affidavit of Publication

j.      City Ex. 10– Strohm Newspapers, Inc.'s Affidavit of Publication

k.     Gift Spot Ex. 11– Letter from Webber to Zoning Commission dated 11/18/02

l.      Glosser Ex. 12– "Fighting Sex Oriented Businesses Through Regulation, Zoning

             and Licensing"

16.    At the November 18 Plan Commission meeting, the Plan Commission was informed by James Schwartz, who served on the committee that drafted the 2002 Ordinance, that there were approximately 256.75 acres, approximately 11.66% of the land in Marshall, available for adult uses under the Ordinance.

17.    At the November 18 Plan Commission meeting, the Plan Commission heard testimony from Morris.  In his testimony, he acknowledged that sexually-oriented businesses are protected by the First Amendment and that studies have found that negative secondary effects result from adult uses such as adult bookstores.  Morris gave specific examples of such negative effects in Marshall, namely,

       i.     the fact that TRW, Inc., a local manufacturing company, had refused to

            locate a plant in the vicinity of Hy Way News in 1993 because of the store,

      ii.    anecdotal evidence that the incidence of police reports involving drunken

and disorderly conduct was considerably higher around Hy Way News than other local business districts, leading to the inference that the resulting nuisance would discourage shoppers from patronizing the nearby retail shops and hotels, and

iii.   the incompatibility of adult bookstores with the planned development of a regional shopping center district in that area.

Morris indicated that the Ordinance would make it more difficult for impulse patrons of adult bookstores to act on those impulses and actually visit the adult bookstores.  He also acknowledged that the Ordinance would offer ION the options of changing the content of its stock in trade or moving.  He testified that the Plan Commission considered the amount of land that would be available for an adult bookstore if it was restricted to industrial zones (I-1 or I-2) and was subject to a 1,000 foot barrier or a 1,500 foot barrier from certain sensitive uses such as schools, day care centers, cemeteries, pubic parks, forest preserves, public housing units, places of religious worship, other adult uses and property zoned as regional shopping center districts.  He testified that the Plan Commission found that a 1,500 foot barrier did not leave sufficient alternate space available for the bookstore but that a 1,000 foot barrier did because it left approximately 12% of Marshall open to an adult bookstore.  Morris testified that he had consulted the Minnesota Attorney General's Report and a 1996 report by Len Munsil entitled "Protecting Communities from Sexually Oriented Businesses" ("Munsil Report") in preparing the Morris Report and his testimony.

18.   In addition to Morris's testimony at the November 18 hearing, the Plan Commission

considered the Morris Report.  The Morris Report echoes Morris's testimony and includes a description of one other incident:  the 1990 kidnaping and rape of a young girl by a truck driver who had viewed and been excited by sexually oriented material from Hy Way News prior to abducting the girl from a nearby residential neighborhood.  The Morris Report contains no first-hand, scientific studies relating to adult uses in Marshall.

19. The Plan Commission considered the Minnesota Attorney General's Report.  That report describes efforts in Minnesota "to assist public officials and private citizens in finding legal ways to reduce the impacts of sexually oriented businesses."  Minnesota Attorney General's Report, Introduction.  The report "discusses evidence that sexually oriented businesses, and the materials from which they profit, have an adverse impact on the surrounding communities" and suggests ways of decreasing those adverse impacts.  *Id.* The report authors reviewed evidence from other studies conducted in Minneapolis (1980), St. Paul (1978) and other studies and concluded that "sexually oriented businesses are associated with high crime rates and depression of property values." Minnesota Attorney General's Report, Impacts of Sexually Oriented Businesses.  The report authors also heard testimony and concluded therefrom that "the character of a neighborhood can dramatically change when there is a concentration of sexually oriented businesses adjacent to residential property." *Id.*

20. Other witnesses testified at the November 18 Plan Commission hearing in favor of the Ordinance.  Some complained that adult bookstores produced sexually oriented litter (including novelties, lingerie and blow-up dolls) in areas where children could find it, facilitated sexual predators, discouraged businesses and retail shoppers from coming to

11

the area, discouraged people from moving to Marshall, and caused negative secondary effects as documented in studies of other communities.  Some speakers urged passage of the Ordinance to suppress the speech purveyed by ION.

21.    ION's attorney testified and presented a letter at the November 18 Plan Commission hearing against passage of the Ordinance.  He asserted that the Ordinance was targeting the content of the speech Hy Way News and The Gift Spot provide.  He also informed the Plan Commission that the studies cited in the Morris Report were faulty and unreliable.

22.    At the conclusion of the hearing, the Plan Commission recommended that Marshall Council pass the Ordinance.  The recommendation cited Morris's research, the Minnesota Attorney General's Report, and other studies in other communities.  It also made findings that sexually oriented businesses are associated with certain negative phenomena, yet recognized the First Amendment protections due to such businesses.

23.    On November 25, 2002, Marshall passed the 2002 Ordinance, which, among other things, regulates adult uses.

24.    Prior to November 25, 2002, Marshall did not have any adult use regulations either in its zoning ordinance or otherwise.

25.    On July 11, 2005, Marshall amended its Zoning Ordinance, including those sections which relate to adult uses, by passing Ordinance No. 2005-O-16, Zoning No. 2005-Z-4.

The Gift Spot

26.    On or about November 22, 2002, ION opened its doors doing business as The Gift Spot. At this location, The Gift Spot offers various items for sale or rent, including adult magazines, adult video tapes, adult DVDs and adult novelty items.

12

27.    The Gift Spot also has fifteen (15) private booths in which a customer may view adult videos and/or DVDs.

28.    The Gift Spot is located on a two-acre site.

29.    Under the Ordinance, The Gift Spot, as currently operated, is an adult bookstore because "a substantial or significant portion of its sales or stock in trade" is made up of "books, magazines, films for sale or for viewing on premises by use of motion picture devices or by coin operated means, and periodicals which are distinguished or characterized by their emphasis on matter depicting, describing or relating to specified sexual activities,' or 'specified anatomical areas.'"

30.    Under the Ordinance, The Gift Spot, as currently operated, is a nonconforming use as it is in an area that is not zoned where adult uses are permitted.

31.    On March 17, 2003, Marshall notified The Gift Spot that it was a non-conforming use subject to amortization and that it would have to file for a certificate of non-compliance.

32.    On May 12, 2003, The Gift Spot applied for an adult use license and continued to operate.

33.    The amortization period defined in the Ordinance has elapsed.

34.    The Gift Spot is not in compliance with the Ordinance and has not applied for a certificate of non-compliance.

35.    The Gift Spot is presently open and operating pursuant to an informal agreement between the parties that Marshall would not enforce the Ordinance pending resolution of the pending legal action.

36.    If the Ordinance is enforced against The Gift Spot it will change the content of its

inventory so that it is no longer an adult bookstore as opposed to moving to another location within Marshall where an adult bookstore would be permitted.

Hy Way News

37.    Hy Way News was an adult bookstore that was also located at the interchange of Interstate 70 and Illinois Highway One, but it was not located within Marshall.

38.    The property on which Hy Way News was located was annexed by Marshall at the landlord/property owner's request on March 10, 2003.

39.    On May 12, 2003, Hy Way News applied for an adult use license and continued to operate.

40.    Hy Way News was owned and operated by the same owners as The Gift Spot.

41.    Hy Way News ceased operations within one year after The Gift Spot opened and has not sought to reopen in Marshall.

42.    Hy Way News was in business for eighteen years, from approximately 1985 to 2004.

Secondary Effects

43.    When Hy Way News opened in the mid-1980s, calls to the Marshall Police Department about the area where Hy Way News was located increased to a daily or weekly basis and exceeded the calls from other areas of town.  The calls reported such things as batteries, assaults, traffic accidents, and thefts of motor vehicles.  There was somewhat conflicting evidence on this point.  John Trefz ("Trefz"), a former Marshall police officer, police chief and mayor, testified to the foregoing primarily based on his memories of his experience in the police department from 1977 to 1997, both before and after Hy Way News opened.  On the other hand, Robert Bruce McLaughlin ("McLaughlin"), ION's

14

expert witness, testified that from July 21, 2001, to October 6, 2004, there were only twenty calls to the police department from the vicinity of Hy Way News or The Gift Spot.  Based on his demeanor while testifying, his intelligence, his basis for knowledge and the reasonableness of his testimony in light of all the evidence in the case, the Court finds Trefz to be credible.  The Court further finds that McLaughlin's testimony, even if true, does not cast serious doubt on Trefz's testimony because it does not cover the time period about which Trefz testified.

44.    Litter of sexually oriented material was plentiful in a field near Hy Way News and has been found in a children's soccer field near The Gift Spot.

45.    In October, 1991, David Thompson abducted and sexually assaulted a little girl from Marshall after viewing sexually oriented material from Hy Way News.

46.    When TRW was considering expanding its Marshall facility in the early 1990s, its preferred expansion site was in the vicinity of Hy Way News.  TRW officials rejected that site because it did not want directions to the plant to include, "Turn left at the adult bookstore sign."  TRW selected another site in Marshall.  There was somewhat conflicting testimony on this issue.  John Welborn ("Welborn"), a former facilities maintenance manager at TRW, testified to the foregoing.  McLaughlin testified that by examining newspaper reports and talking to librarians he was unable to verify that TRW was considering a site near Hy Way News but rejected the site because of the adult bookstore.  Based on his demeanor while testifying, his intelligence, his basis for knowledge and the reasonableness of his testimony in light of all the evidence in the case, the Court finds Welborn to be credible on this point.  On the other hand, McLaughlin's

basis for knowledge – newspaper reports, librarians and a brief conversation with a City employee – was not as reliable as Welborn's direct knowledge of TRW's decisionmaking process.  McLaughlin's testimony is therefore not sufficient to call into question Welborn's credible testimony.

47.   TRW's current site requires truck traffic to pass through the center of Marshall and residential areas.

48.   Between 1998 and 2003, the assessed values of the properties on the block containing Hy Way News and, for at least a year, The Gift Spot increased an average of approximately 28%.  This number reflected the average of one new construction property that increased in assessed value by approximately 90% and seven other properties that increased in assessed value by approximately 7%.  In the same time period, the assessed values of the properties on a similar block without an adult use in a similar community in Clark County increased by approximately 17%.  This number reflects the average of thirteen assessed property values ranging from approximately 58% to approximately -26%.

49.   The presence of an adult use would deter approximately 10 to 15% of commercial investors or retail stores from locating in the vicinity of the adult use and would deter 10 to 15% of potential shoppers from visiting retail stores in the vicinity of the adult use.

50.   McDonald's opened a new restaurant in the immediate vicinity of Hy Way News while Hy Way News was in operation.

Expert Evidence

51.   In making its decision to regulate adult uses through zoning and in drafting and enacting the Ordinance, Marshall used materials, research findings, zoning and planning principles

16

and standards that are generally acceptable in the field of urban planning.  One of those materials, the Minnesota Attorney General's Report, is a good, but not perfect, summary of prior studies and, under generally acceptable planning standards, a community could use and rely on the report in establishing adult use zoning criteria.  There was considerable conflicting testimony on these points.  Leslie S. Pollock ("Pollock"), a city planner and zoning consultant, testified to the foregoing at trial as an expert witness for Marshall.  McLaughlin testified to the contrary and noted numerous flaws in the studies relied on by Marshall in enacting the Ordinance.  The Court finds Pollock's opinion more persuasive than McLaughlin's.  Pollock's testimony was reasonable and consistent with the record and with other judicial decisions.  McLaughlin's analysis was not as complete as Pollock's.  For example, McLaughlin did not examine as thoroughly all the information used by Marshall, did not cast serious doubt on a major thrust of the Minnesota Attorney General's Report as a whole – the correlation between predominantly sexually oriented businesses and negative secondary effects – and did not acknowledge the judicially recognized value generally of non-empirical, non-scientific studies and specifically of the Minnesota Attorney General's Report to urban planning for adult uses.  It did not therefore significantly detract from Pollock's opinion.  In addition, Pollock's demeanor while testifying was more convincing.

52.     Under the Ordinance, 94.1 acres, or 4.1% of Marshall, is available for adult uses.  This figure considers a 1,000-foot buffer zone from residential zones in addition to other sensitive uses specifically listed in the Ordinance.  Three areas containing a total of 33 sites are available to accommodate an adult use occupying two acres, as The Gift Spot

currently does.  Sewer and water is available at all the sites.  Some of those sites would require road construction and all would require subdivision to meet the 1,000-foot property-line-to-property-line buffer zone requirement.  Pollock testified credibly to the foregoing.  McLaughlin's estimate of acreage outside the 1,000-foot buffer zone was lower, but he admitted that his map and calculations omitted one area of land zoned for industrial use that contained three two-acre sites.  His estimate was in all relevant aspects substantially consistent with Pollock's estimate.

53.    Under the Ordinance, Marshall has received no other applications for adult uses or requests for sites other than ION's.

54.    The Ordinance's site plan review process reflects the procedures and standards commonly accepted and regularly applied in urban planning.

## II.  CONCLUSIONS OF LAW

The Court has jurisdiction over this case under 28 U.S.C. § 1331.

ION brought this action pursuant to 42 U.S.C. § 1983 alleging that Marshall violated ION's First Amendment rights.  The First Amendment to the United States Constitution provides "Congress shall make no law . . . abridging the freedom of speech . . . or the right of the people peaceably to assemble. . . ."  U.S. Const. amend. 1.  The Due Process Clause of the Fourteenth Amendment makes First Amendment free speech and assembly guarantees applicable to states and their municipal subdivisions as well as the federal government.  *Gitlow v. New York*, 268 U.S. 652, 666 (1925);  *Ben's Bar, Inc. v. Village of Somerset*, 316 F.3d 702, 707 (7th Cir. 2003).  ION also alleges direct violations of its Fourteenth Amendment due process rights.

18

A.      Restraint of Speech:  Enactment of Ordinance

ION"s first theory – that the enactment of the Ordinance was an unconstitutional restrain

on speech – is governed by a three-step, sequential inquiry set forth by the Supreme Court in

*Renton v. Playtime Theatres, Inc.*, 475 U.S. 41 (1986), and *City of Los Angeles v. Alameda*

*Books, Inc.*, 535 U.S. 425 (2002).  The Seventh Circuit has recently applied this inquiry in *RVS,*

*L.L.C. v. City of Rockford*, 361 F.3d 402 (7th Cir. 2004).

1.      Total Ban or Time, Place and Manner Regulation

The threshold issue is whether the regulation amounts to a total ban on speech or a time,

place and manner restriction.  *See Alameda Books*, 535 U.S. at 434 (plurality);  *Renton*, 475 U.S.

at 46;  *RVS*, 361 F.3d at 407.  A total ban calls for the Court to apply strict scrutiny, that is, to ask

whether the regulation is necessary to serve a compelling state interest.  A time, place and

manner regulation, on the other hand, may call for the Court to apply intermediate instead of

strict scrutiny, that is, to ask whether the regulation is designed to serve a substantial state

interest without unreasonably limiting alternative avenues of communication.  *Alameda Books*,

535 U.S. at 434 (plurality);  *Renton*, 475 U.S. at 47;  *RVS*, 361 F.3d at 408.  A regulation that

appears on its face to be a time place and manner restriction but that in practice is effectively a

total ban will receive strict scrutiny.  *See Alameda Books*, 535 U.S. at 443 (plurality).

All parties in this case agree that the Ordinance is a time, place and manner restriction as

opposed to a total ban on sexually oriented establishments.  Rather than limiting the speech

itself, the Ordinance restricts the location in which the speech can occur.  The Court therefore

moves to the next step in the three-part inquiry to determine whether strict or intermediate

scrutiny applies.

2.     Predominant Concern Motivating the Regulation

The second stage of the inquiry asks what Marshall's predominant concern was when it passed the Ordinance.  If the predominant purpose of a zoning regulation is to decrease speech, the Court applies strict scrutiny.  *RVS*, 361 F.3d at 407.  However, if the predominant purpose is to decrease the secondary effects of the speech, but not the speech itself, the Court applies intermediate scrutiny.  *RVS*, 361 F.3d at 407-08;  *Ben's Bar*, 316 F.3d at 723;  *see Alameda Books*, 535 U.S. at 440-41 (plurality);  *Alameda Books*, 535 U.S. at 448-49 (Kennedy, J., concurring);  *Renton*, 475 U.S. at 47.  In making the decision about the predominant purpose of the regulation, the Court can consider "a wide variety of materials including, but not limited to, the text of the regulation or ordinance, any preamble or express legislative findings associated with it, and studies and information of which legislators were clearly aware."  *RVS*, 361 F.3d at 410 n. 5 (internal quotations and citations omitted).

The predominant purpose of the Ordinance was to decrease the secondary effects of sexually oriented businesses in order to protect the public health, safety and welfare of Marshall's citizens and to protect the property tax and sales tax base of Marshall.  The Preamble clearly reflects this intention.  It demonstrates that Marshall officials believed, based on the Morris Report and the Minnesota Attorney General's Report, that there was a connection between negative secondary effects and speech purveyed by adult bookstores and that zoning was an appropriate and effective means to reduce those negative secondary effects.  The connection between negative secondary effects and speech was reinforced by testimony at the Plan Commission hearing relating specifically to Marshall and to negative secondary effects connected to Hy Way News and The Gift Spot, including but not limited to the rape and

abduction of a young girl by an individual who had viewed sexually oriented materials at Hy Way News prior to the incident, litter of a sexually oriented nature (novelties, lingerie) on children's soccer fields adjacent to The Gift Spot, TRW's refusal to locate near an adult bookstore and a higher rate of police reports from the vicinity of Hy Way News compared to other business districts.  The Preamble further reflects that Marshall officials were aware that the speech purveyed by adult bookstores is protected by the First Amendment and that Marshall was attempting to provide adequate alternative sites for that speech by ensuring that approximately 12% of the land within Marshall was available for adult uses.  This effort to provide adequate alternative channels belies ION's allegation that the Ordinance was a mere pretext for suppression of protected speech, although whether the alternative channels provided were, in fact, adequate is a matter discussed later in this order.

It is true that some testimony presented to the Plan Commission reflected a desire on the speakers' part to suppress speech, and one part of the Morris Report expressed an intent to decrease speech by making it more difficult for impulse patrons driving by on the interstate to access the adult bookstore.  However, the Court finds that neither the Plan Commission nor the City Council relied on those desires or goals in any substantial way in recommending or enacting the Ordinance but instead relied predominantly on the other aspects of the Morris Report, the Minnesota Attorney General's Report and the references cited therein to address the deleterious secondary effects of protected speech, as stated in the Preamble.

There was also testimony at the Plan Commission meeting that the Morris Report, the Minnesota Attorney General's Report and the studies they cite are flawed and unreliable.  That testimony, however, was not presented to the Plan Commission or the City Council in sufficient

21

detail or with enough support to cause a reasonable person to seriously doubt the validity of those studies and reports.  Furthermore, although the Minnesota Attorney General's Report may have contained some errors in summarizing prior studies connecting adult uses with negative secondary effects, the Court accepts Pollock's testimony that the report is generally accepted in the urban planning community as a valid basis for making zoning decisions.  It is clear, in fact, that Marshall officials were not convinced by the representation that the reports were flawed and unreliable and that they continued to reasonably rely on those reports for the purpose of combating the negative secondary effects of protected speech, not censoring speech itself. Therefore, intermediate scrutiny applies.

> 3.    Intermediate scrutiny

When the Court applies intermediate scrutiny, it asks whether the regulation is narrowly tailored to serve a substantial government interest while not unreasonably limiting alternative avenues of communication.  *Renton*, 475 U.S. at 47, 50;  *RVS*, 361 F.3d at 408-09.

> a.    Substantial Government Interest:  Connection Between Secondary
> Effects and Speech

Substantial government interests can include preserving the quality of urban life and reducing crime.  *See Alameda Books*, 535 U.S. at 435 (plurality) and 444 (Kennedy, J., concurring).  It also includes the types of interests for which the Ordinance were passed in this case.  However, in order to withstand intermediate scrutiny, there must be a connection between the negative secondary effects and the regulated speech.  *Alameda Books*, 535 U.S. at 441 (plurality);  *RVS*, 361 F.3d at 408.  A sufficient connection is established "if the evidence upon which the municipality enacted the regulation 'is reasonably believed to be relevant for demonstrating a connection between [secondary effects producing] speech and a substantial,

independent government interest.'" *RVS*, 361 F.3d at 408 (quoting *Alameda Books*, 535 U.S. at 438 (plurality) (internal quotations omitted)).

In *Alameda Books*, Justice Kennedy's concurrence breaks this inquiry into two separate questions:  (1) What is the proposition that a city needs to advance in order to sustain a secondary effects ordinance? and (2) How much evidence is required to support the proposition? *Alameda Books*, 535 U.S. at 449-50 (Kennedy, J., concurring);  *RVS*, 361 F.3d at 408-09.

### i.   The Proposition that Must Be Advanced

The proposition must be that the regulation of the speech will significantly reduce the secondary effects without substantially reducing the speech or causing it to cease.  *Alameda Books*, 535 U.S. at 449 (Kennedy, J., concurring) ("[A] city may not assert that it will reduce secondary effects by reducing speech in the same proportion.");  *RVS*, 361 F.3d at 411-12. Fundamental to this proposition is that the regulated aspect of the speech (e.g., the location or the concentration of the speech) causes, or is reasonably believed to cause, the secondary effects. *See, e.g., RVS*, 361 F.3d at 411 (noting that the ordinance's premise must be that locating the speech in certain areas will significantly reduce secondary effects without diminishing the availability of the speech).

In this case, the proposition is that the proximity of adult uses such as The Gift Spot to schools, day care centers, cemeteries, public parks, forest preserves, public housing units, places of religious worship, other "adult uses" or property zoned as a regional shopping center district causes negative secondary effects and that relegation of adult uses to industrial zones that are more than 1,000 feet from those sensitive uses will reduce those secondary effects without unreasonably limiting the protected speech.

ii.     The Evidence to Support the Proposition

A municipality "may rely on any evidence that is 'reasonably believed to be relevant' for demonstrating a connection between speech and a substantial, independent government interest." *Alameda Books*, 535 U.S. at 438 (plurality) (citing *Renton*, 475 U.S. at 51-52).  This standard is not particularly demanding;  the municipality need produce "very little" evidence to satisfy its burden.  *Alameda Books*, 535 U.S. at 451 (Kennedy, J., concurring);  *RVS*, 361 F.3d at 411. "The Supreme Court has consistently held, 'a city must have latitude to experiment, at least at the outset, and . . . very little evidence is required [to support an ordinance's proposition].'" *RVS*, 361 F.3d at 411 (quoting *Alameda Books*, 535 U.S. at 451 (Kennedy, J., concurring)); *accord Alameda Books*, 535 U.S. at 439 (plurality);  *Renton*, 475 U.S. at 52.  If a city's conclusions appear reasonable, the Court should not find that they are unsupported.  *Alameda Books*, 535 U.S. at 452 (Kennedy, J., concurring)).

The evidence can include, among other things, studies, judicial opinions and experience-based testimony.  *RVS*, 361 F.3d at 411.  Furthermore, it is not necessary that the rule-makers actually have considered the evidence when they passed the subject regulation so long as it supports the necessary proposition.  *RVS*, 361 F.3d at 411 n. 6;  *compare Alameda Books*, 535 U.S. at 442 (plurality) (leaving question open).

Shoddy data or reasoning, however, is insufficient, and a party opposing the regulation can cast doubt on the rationale for the ordinance "either by demonstrating that the municipality's evidence does not support its rationale or by furnishing evidence that disputes the municipality's factual findings."  *Alameda Books*, 535 U.S. at 438-39 (plurality).  If the party opposing the regulation is able to cast doubt on the rationale, the burden shifts back to the municipality to

supplement the record with further evidence.  *Id.* at 439.

In this case, Marshall relied on evidence that it reasonably believed to be relevant to demonstrate a connection between adult uses and negative secondary effects on public health, safety and welfare, including preserving the quality of life, increasing the economic welfare and reducing crime in Marshall.  The reports and anecdotal evidence relied on by Marshall in enacting the Ordinance provide sufficient evidence to support the necessary proposition.  While the Minnesota Attorney General's Report may not be a study carried out with scientific precision and may contain some inaccuracies or misstatements, it and the studies upon which it relies clearly establish some connection between adult uses and negative secondary effects.  That connection is sufficiently strong for the urban planning community to regard the Minnesota Attorney General's Report as a reliable basis for planning to regulate adult uses.

That connection was bolstered in this case by anecdotal evidence that in Marshall itself, the existing adult uses contribute to litter of a sexual nature in areas that are frequented by numerous children, have discouraged industrial development in the vicinity, have played a role in the abduction and rape of a small girl and, at a minimum, appear to correlate generally to increased police reports.  It is further a reasonable inference from the Minnesota Attorney General's Report and the anecdotal evidence presented to Marshall that residential and commercial values around adult uses would decline;  people are unlikely to want to live or establish retail businesses in relatively high crime areas or where litter of a sexual nature is regularly found.  That McDonald's chose to open a restaurant near Hy Way News after it opened does not negate this reasonable inference relating to peoples' preferences in general.  In fact, ION's expert witness admitted that 10 to 15% of commercial investors would be deterred from

locating near adult uses.  The material considered by Marshall provided sufficient evidence upon which a reasonable municipal governing body could find a connection between adult uses and negative secondary effects and could experiment with restricting the location of adult uses to industrial zones at least 1,000 feet from sensitive uses in an effort to significantly reduce or avoid those secondary effects.

ION argues that Marshall used shoddy data and reasoning in enacting the Ordinance. First, McLaughlin alleged inaccuracies and unscientific methods in the Minnesota Attorney General's Report and asserts that it is therefore unreliable as a basis for Marshall's zoning decisions.  Those inaccuracies, however, even if they exist, only weaken the strength of the report and may have allowed Marshall to reach an opposite and equally reasonable conclusion. They do not, however, totally negate the report's general conclusion that adult uses are connected to negative secondary effects.  Furthermore, Pollock acknowledged that the report may contain some inaccuracies but testified that it was still the type of report generally accepted in the urban planning community to guide zoning decisions.  As noted earlier, the Court has found Pollack's assessment of what is generally acceptable to urban planners to be more credible than McLaughlin's.  Thus, any flaws or lack of scientific certainty in the report do not destroy its relevance as a reasonably reliable planning document that a municipality can use to experiment with ways to curb negative secondary effects.  *G.M. Enters. v. Town of St. Joseph*, 350 F.3d 631, 640 (7th Cir. 2003) (rejecting the "suggestion that the municipality be required to present empirical data in support of its contention"), *cert. denied*, 543 U.S. 812 (2004).

ION and McLaughlin also fault Marshall for failing to consider other studies that found no evidence of any negative secondary effects correlating with adult uses.  However, especially

in the absence of any glaring red flags in the reports it considered, Marshall was not required to scour the nation to find reports that contradict the reliable documentary and testimonial evidence before it.  The evidence it considered was reasonably reliable and supported a connection between adult uses and negative secondary effects.

ION further argues that the locations available for adult uses are on either on the extreme southern end of town or farther from the Interstate 70 exit, from which most of ION's customers come, than the current location of The Gift Spot.  ION argues that these locations would create more traffic in residential and downtown areas where children are, a result contrary to the Ordinance's stated purpose.  Marshall counters that the locations selected are served by major roads, which would not necessarily cause an increase in traffic on smaller downtown or residential streets, where children are most likely to be.  The Court finds no logical inconsistency in Marshall's rationale and the Ordinance.  It is clear that Marshall has chosen the available locations primarily to reduce negative secondary effects other than increased traffic on main roads.  If Marshall has chosen to address those other effects at the expense of creating more traffic on its main roads, it is free to do so as a part of its experiment with addressing those secondary effects.  Again, Marshall must be given wide latitude to experiment with ways of combating negative secondary effects, and the Court will not find their experiment unsupported because it does not address all of those effects equally.

ION also points to McLaughlin's study of assessed land values to show that adult uses do not decrease property values in the vicinity of the adult use.  McLaughlin's studies are not persuasive.  First, assessed property values are not as accurate indicators of land value as appraised property values, which McLaughlin did not study.  Second, and more importantly,

27

McLaughlin's study only compared two areas and, in Marshall, contained an outlier value based on new construction that tended to skew the results away from the median assessed value. The small size of the study and the outlier make the study less reliable as a basis to draw general conclusions. As a consequence, the Court does not find the study significantly probative of property values.

The Court also notes that ION did not negate the connection between adult uses and all the negative secondary effects recognized by Marshall. For example, there was no credible evidence to contradict that sexually oriented businesses correlate with increased litter of a sexual nature in areas frequented by children or with increased crime. The connection between adult uses and these negative effects alone is sufficient to support the proposition upon which Marshall's Ordinance was based.

Finally, ION notes that the reports and studies relied on by Marshall were based on adult use establishments that were comprised of nearly 100% adult uses. These studies, it argues, cannot provide the connection between negative secondary effects and adult use establishments that are comprised of less than 100% adult uses, that is, that those establishments that have only a "substantial or significant" but not 100% adult use business. First, the Court notes that ION does not have standing to raise such an argument as it admits that its business is virtually 100% adult use. Second, the *Alameda Books'* evidentiary test is not so demanding. It does not demand perfect scientific studies of the exact path a municipal body chooses to take, but only demands evidence that is reasonably believed to be relevant. It is reasonable to believe that studies of 100% adult use establishments would be relevant to "substantial or significant" adult use establishments, even if they do not perfectly correlate. Thus, it was reasonable in this case for

28

Marshall to make the inference that the studies were relevant to regulating "substantial or significant" adult use establishments.

In sum, the Court finds that Marshall relied on evidence reasonably believed to be relevant to demonstrate a connection between adult uses and negative secondary effects, and ION has not cast doubt on Marshall's rationale for the ordinance such that the burden is shifted to Marshall to supplement the record with further evidence. Even if ION had shifted the burden, the evidence submitted at trial from Pollack and other witnesses was sufficient to establish a connection between adult uses and negative secondary effects.

The Court now turns to the question of whether the Ordinance leaves the "'quantity and accessibility of speech substantially intact.'" *RVS*, 361 F.3d at 408 (quoting *Alameda Books*, 535 U.S. at 449 (Kennedy, J., concurring)), that is, whether it is narrowly tailored and whether it leaves adequate alternative avenues of communication.

### b.    Narrow Tailoring

An ordinance is narrowly tailored if it "advance[s] a substantial interest that would be achieved less effectively absent the restrictions, and the restrictions do not 'burden substantially more speech than is necessary' for such advancement." *Pleasureland Museum, Inc. v. Beutter*, 288 F.3d 988, 1002 (7th Cir. 2002) (quoting *Ward v. Rock Against Racism,* 491 U.S. 781, 799 (1989)); *see, e.g., RVS*, 361 F.3d at 413 (holding that regulation is not narrowly tailored because it could be applied to cover mainstream speech). Narrow tailoring does not require the least restrictive means of serving the interest at issue. *Pleasureland*, 288 F.3d at 1002. The Court should also consider whether the regulation targets the expressive conduct itself or the non-expressive aspects of the speech such as location or signage. *See, e.g., G.M. Enterps. v. Town of*

*St. Joseph*, 350 F.3d 631, 638 (7th Cir. 2003) (ordinance aimed at minimizing non-expressive factors that heightened the probability of adverse secondary effects, not the speech itself).

In this case, the Ordinance is narrowly tailored.  It does not prohibit adult uses but instead targets the non-expressive aspects of adult use establishment – the proximity to areas where children, families and retail businesses are.  Furthermore, the prohibitions advance the substantial government interest of curtailing negative secondary effects by certain adult businesses.  That the Ordinance may not be the least restrictive means of serving that interest is immaterial.

To the extent that ION argues the ordinance is overbroad in its coverage, the Court addresses those arguments in a later section of this order.

The Court turns now to the question of whether adequate alternative avenues of communication are available.

c.    <u>Alternative Avenues of Communication</u>

The Court must consider whether the Ordinance allows ION reasonable adequate alternative avenues of communication.  *Alameda Books*, 535 U.S. at 434 (plurality) (citing *Renton*, 475 U.S. at 50).  A regulation cannot effectively deny an adult bookstore a reasonable opportunity to operate.  *Id.* at 54.

The Court finds that the Ordinance provides adequate alternative avenues of communication to Marshall's population.  Under the Ordinance, 94.1 acres, or 4.1% of the land in Marshall, is available for ION to open an adult bookstore.  Assuming ION cannot operate its business on a lot smaller than its current two-acre lot, those 94.1 acres provide three possible areas of land divisible into 33 possible sites for ION to locate an adult bookstore;  if it can

30

operate on a lot smaller than two acres, even more sights would be available.  That ION may have to subdivide the property or have roads built to some of the new sites does not render the land unavailable for constitutional purposes.  *See Renton*, 475 U.S. at 54 (noting that the First Amendment does not require a city to relieve adult use establishments of ordinary hurdles presented by the real estate market).  The Court further notes that ION is the only adult use entity showing any interest in locating in Marshall, so no lots would be unavailable because of the location of another adult use.

ION does not really contest that the sites available in Marshall are inadequate to communicate *to Marshall's population*.  Instead, it argues that the sites are inadequate to enable it to communicate *to ION's main source of patrons* – Interstate 70 travelers – who ION believes will not want to drive through town or far distances from the interstate highway exit to visit an adult bookstore.  In this context, however, there are certainly numerous alternative avenues of communication to interstate highway travelers.  There is a multitude of available sites outside Marshall's city limits, not subject to the Ordinance, and close to interstate highway exits.  These sites must be considered as alternative avenues of communication because they would be equally, if not more, effective than the sites available in Marshall at communicating ION's speech to its target audience.  In this specific situation – a rural community with substantial amounts of undeveloped land in the surrounding area and a target audience located in an extreme end of the community near that undeveloped land – it would serve no purpose to limit the universe of available land to those parcels within Marshall's city limits.  While the Constitution may entitle ION to alternative avenues of communication, it does not require that the Court disregard the reality that land is indeed available in areas that meet ION's main criterion for

31

development – proximity to an Interstate 70 exit.

In light of the available avenues of communication in and outside Marshall, the Court finds that ION has adequate alternative avenues of communication.  The impact of the site plan review process on whether these alternative avenues are truly available is discussed later in this order.

B.    Vagueness and Overbreadth

ION makes a facial challenge to the vagueness and overbreadth of the definition of "adult bookstore.  Specifically, ION argues that the first part of the definition of an adult bookstore violates the due process clause of the Fourteenth Amendment because the phrase "substantial or significant" does not specify how or what to measure in order to determine if it is "substantial or significant" and therefore does not give fair notice of what is permitted and proscribed.  *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 497-98 (1982);  *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972) ("an enactment is void for vagueness if its prohibitions are not clearly defined").  ION further argues that the definition of "adult bookstore" is overbroad because it could apply to mainstream bookstores and undoubtedly would apply to some businesses for which there is no evidence to show that they produce negative secondary effects.  *Grayned*, 408 U.S. at 114 ("A clear and precise enactment may nevertheless be 'overbroad' if in its reach it prohibits constitutionally protected conduct.").  For example, the second part of the definition would apply to a mainstream bookstore that mentions in an advertisement that it has an adult section, even the adult section is minuscule and actually has no sales.

ION does not seriously contest that it does not have standing to raise a challenge on its

32

own behalf.  It admits that it qualifies as an adult bookstore, so it is unable to complain that the Ordinance's allegedly vague or overbroad definition of "adult bookstore" is causing it any harm that would be redressed by favorable decision in this litigation.  *See Hoffman Estates*, 455 U.S. at 495;  *Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 59 (1976) (plurality opinion) (holding that where ordinance is unquestionably applicable to a litigant, any vagueness has not affected them and does not violate due process);  *Harp Advertising Ill., Inc. v. Village of Chicago Ridge*, 9 F.3d 1290, 1292 (7th Cir. 1993);  *Basiardanes v. City of Galveston*, 682 F.2d 1203, 1210 (5th Cir. 1982).  ION's challenge, then, must be on behalf of third parties not before the Court who may be deterred from engaging in protected speech by the Ordinance's alleged vagueness or overbreadth.  This exception to traditional rules of standing "is justified by the overriding importance of maintaining a free and open market for the interchange of ideas."  *Young*, 427 U.S. at 60.

    1.   <u>Vagueness</u>

A plaintiff may raise a vagueness due process challenge on behalf of third parties "when the effect of a vague ordinance on legitimate expression is real and substantial and the language of the ordinance is not readily subject to a narrowing construction by state courts."  *Basiardanes*, 682 F.2d at 1210 (citing *Young*, 427 U.S. at 60 (plurality opinion)).

In this case, the Court finds that any vagueness in the Ordinance's definition of "adult bookstore" is not so real and substantial as to have a significant deterrent effect on others wanting to engage in the type of protected speech purveyed by adult bookstores.  First, there is no real ambiguity in the phrase "substantial or significant" that cannot be readily cured by a narrowing construction provided by state courts.  In fact, many federal statutes use terms like

substantial or significant without terrible problems.  *See 15192 Thirteen Mile Rd., Inc. v Warren*, 626 F. Supp. 803, 820-21 (E.D. Mich. 1985).  Furthermore, the evidence established that Marshall was prepared to give further guidance to businesses seeking to determine how to construe the Ordinance.  The same is true for other words and phrases in the "adult bookstore" definition that ION believes are vague.  Second, the Supreme Court has recognized a less vital interest in sexually oriented speech than in speech conveying ideas of social and political significance.  *Young*, 427 U.S. at 61 (plurality opinion).  Third, the alleged vagueness in the Ordinance is not a qualitative restriction.  It does not have the potential of misleading anyone about the speech that is allowed or not allowed.  Instead, it addresses the *amount* of speech that will bring one under the Ordinance's restrictions.  Such a definition is unlikely to totally suppress any specific type of communication, although it may have an impact on the quantity someone chooses to purvey.  In combination, these factors convince the Court that the Ordinance's definition of "adult bookstore" does not threaten the free market in ideas and expression in such a way that justifies hearing a vagueness challenge on behalf of third parties.

Even if the Court were to entertain such a challenge, it would find that the ordinance is not unconstitutionally vague.  The Seventh Circuit Court of Appeals has decided that ordinances defining businesses by whether a "substantial portion of its stock and trade" is devoted to the certain activities are not unconstitutional.  *See Pleasureland Museum, Inc. v. Beutter*, 288 F.3d 988, 997 n. 4 (7th Cir. 2002) (citing *Young*, 427 U.S. at 53 n. 5);  *see also 15192 Thirteen Mile Rd.*, 626 F. Supp. at 820-821.

2.   <u>Overbreadth</u>

A plaintiff may raise a First Amendment overbreadth challenge on behalf of third parties

if he can "establish 'a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court.'"  *Pleasureland Museum, Inc. v. Beutter*, 288 F.3d 988, 996 (7th Cir. 2002) (quoting *City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 801 (1984));  *Genusa v. City of Peoria*, 619 F.2d 1203, 1210 (7th Cir. 1980).  If the challenged ordinance does not reach a substantial amount of protected conduct, it is not overbroad.  *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494 (1982).  "[T]he mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge."  *Vincent*, 466 U.S. at 800.

In this case, the Court finds that any conceivable impermissible application of the definition of "adult bookstore" – specifically, applying to mainstream bookstores the second part of the definition regarding establishments that "hold themselves out" as purveying adult material – is not likely to inhibit free expression so as to justify entertaining a facial challenge on behalf of third parties not before the Court.  First, the Court finds it unlikely that there would be a substantial number of establishments in Marshall that would be encompassed by the "holding out" category that would not also be encompassed by the first part of the definition.  Second, the Court notes that the "holding out" phraseology would tend not to effect the content or the quality of the actual speech purveyed by an establishment as much as the way it represents itself to the public, that is, its commercial speech.  Commercial speech does not demand the same level of protection from overbreadth as speech of social or political significance.  *See Hoffman Estates*, 455 U.S. at 497 ("[T]he overbreadth doctrine does not apply to commercial speech.")  In sum, the Court finds that the "holding out" portion of the Ordinance's definition of "adult bookstore"

poses no real threat to the free market in ideas and expression and is unlikely to significantly effect the protected speech of third parties not before the Court.  Therefore, it is inappropriate for this Court to entertain a facial challenge from ION.  To the extent that a third party believes that the Ordinance is impermissibly applied to it, the Court will entertain an "as applied" overbreadth challenge at that time.

      C.     <u>Restraint of Speech:  Site Plan Review Process</u>

      ION argues that the Ordinance's site plan review provisions operate as an impermissible prior restraint and therefore violate its due process rights in two specific ways.  First, ION argues that city officials have unbridled discretion when deciding whether a site plan conforms with the "goals and policies of the comprehensive plan," Art. XVIII-A, § 4, ¶ 5, and whether to impose conditions that "it deems appropriate or necessary in order to accomplish the purpose of the ordinance," Art. XVIII-A, § 3, ¶ 3.  Second, ION notes that the deadlines for prompt decision and review of an application are triggered by a completed application but that the Ordinance allows a zoning officer to indefinitely delay the completion of an application by demanding unlimited "other items," Art. XVIII-A, § 6, ¶ 5.

      Marshall contends, on the other hand, that the Ordinance sufficiently restrains city officials' discretion and that Illinois law provides adequate due process because it allows for judicial review if a zoning decision is unduly delayed.  Alternatively, Marshall argues that if any of the site plan review provisions are unconstitutional, they should be severed from the Ordinance, which should remain in force.

      "Prior restraints provide public officials with the power to deny the use of a forum in advance of actual expression."  *Pleasureland Museum, Inc. v. Beutter*, 288 F.3d 988, 999 (7th

Cir. 2002).  While not *per se* unconstitutional, prior restraints are highly disfavored and presumed invalid.  *Weinberg v. City of Chicago*, 310 F.3d 1029, 1045 (7th Cir. 2002) (citing *New York Times Co. v. United States*, 403 U.S. 713, 714 (1971));  *see Freedman v. Maryland*, 380 U.S. 51, 57 (1965).  For this reason, a prior restraint is presumed to be constitutionally invalid, and the proponent of a prior restraint bears a heavy burden to show the restraint is justified.  *Schultz v. City of Cumberland*, 228 F.3d 831, 851 (7th Cir. 2000).

Both parties agree that the licensure framework is the appropriate context to analyze the site plan review process.  Licensing prior restraints come in two forms: (1) the placement of "unbridled discretion in the hands of a government official" that might result in censorship and (2) a licensing procedure that does not place time limits on the decision-making process.  *Weinberg*, 310 F.3d at 1045.  Both types are raised in ION's objection to the site plan review process.

1.    Unbridled Discretion

"An ordinance that gives public officials the power to decide whether to permit expressive activity must contain precise and objective criteria on which they must make their decisions;  an ordinance that gives too much discretion to public officials is invalid."  *Lady J. Lingerie, Inc. v. City of Jacksonville*, 176 F.3d 1358, 1361 (11th Cir. 1999) (citing *Shuttlesworth v. City of Birmingham*, 394 U.S. 147 (1969));  *Weinberg v. City of Chicago*, 310 F.3d 1029, 1044 (7th Cir. 2002) (prior restraints on speech must have narrow, objective, and definite standards to guide the licensing authority).  A regulation or law simply may not give public officials "unbridled discretion" to deny permission to engage in constitutionally protected expression.  *Lady J.*, 176 F.3d at 1361;  *see Shuttlesworth*, 394 U.S. at 150-51.  However, regulations need

37

not have "perfect clarity and precise guidance," *Ward v. Rock Against Racism*, 491 U.S. 781,

794 (1989), as long as they "provide principled limits to guide the decisions of government

officials." *DeBoer v. Village of Oak Park*, 267 F.3d 558, 573 (7th Cir. 2001).

Exactly how much guidance on an official's discretion is required to avoid

unconstitutionality is not crystal clear.  The extreme presents an easy case.  For example, it is

clear that a regulation that is devoid of any standards governing whether an officials should issue

peddling permits is too broad.  *Weinberg*, 310 F.3d at 1046.  It has also been long-established

that a parade permit regulation that allows the issuing official to decide whether to issue the

permit based on his judgment of whether the "public welfare, peace, safety, health, decency,

good order, morals or convenience require that it be refused" is an unconstitutional prior

restraint.  *Shuttlesworth*, 394 U.S. at 149-50.  Similarly, an ordinance allowing a mayor to

determine whether newsracks on public property were "in the public interest" and allowing the

official to impose "necessary and reasonable" conditions on the permits to place such newsracks

provides insufficient limitations on the official's discretion and raises the threat of self-

censorship.  *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750 769-73 (1988).  *See,*

*generally, DeBoer*, 267 F.3d at 573 (policy allowing municipality to limit activities in city

building to those that "benefit[] the public as a whole" granted impermissible unfettered

discretion);  *Lady J.*, 176 F.3d at 1362 (noting that zoning ordinance allowing a city to place

unspecified "more restrictive requirements" than those specifically listed in the zoning ordinance

allows too much discretion).

On the other hand, the Seventh Circuit Court of Appeals upheld a parade permit

ordinance requiring a city to issue a permit unless it determined that the parade would

"unnecessarily interfere with traffic in the area contiguous to the route," that there was not "a sufficient number of peace officers" available for the event, or that the activity would "prevent proper fire and police protection or ambulance service." *MacDonald v. City of Chicago,* 243 F.3d 1021, 1024, 1028 (7th Cir. 2001). In *McDonald*, the Court of Appeals held that, even though the ordinance allowed some flexibility to officials, it specified "legitimate safety concerns in as precise a manner as such concerns can reasonably be articulated." *Id.* (quoting *McDonald v. City of Chicago*, 1998 WL 673652, at * 7 (N.D. Ill. Sep. 23, 1998)).

*McDonald* relied heavily on *Graff v. City of Chicago*, 9 F.3d 1309 (7th Cir. 1993) (*en banc*), which also upheld an ordinance against a challenge alleging unbridled discretion. In that case, an ordinance contained six criteria to guide an official's discretion whether to issue a newstand permit:

> (1) Whether the design, materials and color scheme of the newspaper stand comport with and enhance the quality and character of the streetscape, including nearby development and existing land uses; (2) Whether the newspaper stand complies with this code; (3) Whether the applicant has previously operated a newspaper stand at that location; (4) The extent to which services that would be offered by the newspaper stand are already available in the area; (5) The number of daily publications proposed to be sold from the newspaper stand; and (6) The size of the stand relative to the number of days the stand will be open and operating.

*Id.* at 1317-18. The *Graff* court, hearing the case *en banc*, held that these factors adequately limited the city official's discretion because they gave "adequate and specific guidance to the [official] as well as reasons for the applicant to anticipate the basis for granting or denying a particular permit" and were sufficient to allow meaningful review of the official's decision. *Id.* at 1318. The *Graff* court further found that the ordinance did not have a sufficient nexus to expression to pose a real or substantial threat of censorship. *Id.*

39

Courts also differ on whether zoning standards that allow a city to require a site plan, for example, to be consistent with a city's comprehensive plan or the character of the neighborhood pass constitutional muster.  *See Lady J.*, 176 F.3d at 1362;  *Casanova Entm't Group, Inc. v. City of New Rochelle*, 375 F. Supp. 2d 321, 336-37 (S.D.N.Y. 2005), *aff'd*, 2006 WL 238434 (2d Cir. Jan. 31, 2006).  The *Lady J.* court held that such requirements "empower the zoning board to covertly discriminate against adult entertainment establishments under the guise of general 'compatibility' or 'environmental' considerations." *Lady J.*, 176 F.3d at 1362.  The *Casanova* court, on the other hand, in deciding to deny a preliminary injunction, held that an ordinance requiring the exterior appearance of a building to be consistent with the character of the neighborhood and allowing the municipality to impose additional terms and conditions on the site plan that furthered the aims of the ordinance imposed reasonably objective, nondiscretionary criteria.  *Casanova*, 375 F. Supp. 2d at 336-37.  The *Casanova* court noted that such regulations addressed concrete topics that are well known to be within local governments' traditional land use authority and did not "'allow[] the decisionmaking body to manipulate such malleable concepts as welfare, decency, and good order.'"  *Id.* at 337 (quoting *Steakhouse, Inc. v. City of Raleigh*, 166 F.3d 634, 639 (4th Cir. 1999)).

The Court finds that the site plan review process in the Ordinance does not give impermissible unbridled discretion to Marshall officials by referring to the standards set forth in § 4, including comformance with the "goals and policies of the comprehensive plan", Art. XVIII-A, § 4, ¶ 5, and by allowing the officials to impose conditions that "it deems appropriate or necessary in order to accomplish the purpose of the ordinance," Art. XVIII-A, § 3, ¶ 3.  First, to the extent that ION is challenging the standards in § 4, ¶¶ 1-4, the Court finds that those

40

standards are the same type of standards as those approved in *McDonald* and *Graff*.  They do not contain "malleable concepts" like welfare, decency and good order, but instead focus officials' attention on concrete, content-neutral matters that are legitimate municipal planning concerns and that provide sufficient guidance to put applicants on notice of the requirements and provide for meaningful review of Marshall's decisions.  Despite inconsistent findings in *Lady J.* regarding similar types of provisions, the law in this circuit holds that such criteria are constitutionally acceptable.

As for § 4, ¶ 5 and § 3, ¶¶ 2 and 3, all three sections reference the goals, policies and purposes of the Ordinance.  Therefore, they must be considered in the context of the Ordinance's purposes as stated in the first paragraph of the Ordinance's Preamble, the first paragraph of the body of the Ordinance as well as the purposes of the site plan review process as stated in Article XVIII-A, § 1.  In this context, the Court finds that the subject provisions do not provide unconstitutionally broad discretion to Marshall officials.  Had the purposes of the Ordinance as a whole merely been "promoting and protecting the public health, safety, peace, comforts, convenience and general welfare of the inhabitants of the City of Marshall," Ordinance, ¶ 1, or had officials simply been given discretion to impose any additional conditions, the Court might have found city officials' discretion to be unbridled.  However, the Ordinance lists the specific ways in which the "public health, safety, peace, comforts, convenience and general welfare" are to be served by the Ordinance.  Furthermore, Article XVIII-A, § 1 and Article VII, § 8, ¶ 4 clarify that the site plan review process is limited to governing the physical layout and design aspects of establishments subject to those provisions and, by implication, that any condition imposed by city officials are limited to physical layout and design aspects to achieve the specific

41

purposes listed in those provisions.  To the extent that Marshall officials possess flexibility in

imposing additional conditions on site plans, that flexibility is limited by the purposes of

Ordinance.  Similarly, the determination of whether a proposed site plan conforms to those goals

cannot realistically be said to be subject to the whim of a city official.  Furthermore, whether a

plan conforms to those purposes or whether additional conditions imposed by city officials are

necessary or appropriate to achieve those purposes can be readily reviewed by a court.

Therefore, the Court finds that these provisions provide sufficient guidance to render the site

plan review provisions constitutional.

      2.    <u>Opportunity for Delay</u>

"Licensing ordinances must also require prompt decisions.  An ordinance that permits

public officials to effectively deny an application by sitting on it indefinitely is also invalid."

*Lady J. Lingerie, Inc. v. City of Jacksonville*, 176 F.3d 1358, 1361 (11th Cir. 1999) (citing

*Freedman v. Maryland,* 380 U.S. 51 (1965));  *see FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215,

223-24 (1990) (plurality opinion).

ION's only gripe with the Ordinance is that its time limits are triggered by a completed

application, but an application is only complete once it has provided any "other items" requested

by a zoning officer.

The Court finds that this part of the Ordinance is not sufficiently precise and therefore

provides an intolerable opportunity for delay.  This situation differs from the case where there is

a defined list of items that must be submitted to complete an application, and the time limits for

decision-making are not triggered until the application is complete, which is acceptable.  *See*

*Casanova Entertainment Group, Inc. v. City of New Rochelle*, 375 F. Supp. 2d 321, 336-37

42

(S.D.N.Y 2005), *aff'd*, 2006 WL 238434 (2d Cir. Jan. 31, 2006).  In this case, there is no defined list of items that must be submitted precisely because of the last, open-ended requirement that an applicant submit "any other items required by the zoning officer."  There are simply no limits to the zoning officer's discretion about what else he can demand before an application is complete. The Court can imagine a situation where never-ending requests for further documents would mean an application would never be complete and would amount therefore to an indefinite delay in a site plan review decision.  For this reason, the Court finds that Article XVIII-A, § 6, ¶ 5 confers too much discretion on city officials and cannot be constitutionally applied to applicants who purvey speech protected by the First Amendment.

    This flaw, however, will not by itself invalidate the entire Ordinance.  The Ordinance contains a severability clause declaring that if any clause or provision of the Ordinance is declared invalid by a court, the remainder of the ordinance remains in full force and effect.  A severability clause can save the constitutionally viable portions of an ordinance if the invalid portions are not "an integral part of the statutory enactment viewed in its entirety."  *Zbaraz v. Hartigan*, 763 F.2d 1532, 1545 (7th Cir. 1985), *quoted in Pleasureland Museum, Inc. v. Beutter*, 288 F.3d 988, 1005 (7th Cir. 2002).  The Court finds that the second part of Article XVIII-A, § 6, ¶ 5 – "and/or any other items required by the zoning officer" – is not integral to the Ordinance as a whole and can be severed workably from the remainder of the Ordinance.  It simply defines another category of material to be submitted with an application and will not impact in any way on the continued application of the remainder of Article XVIII-A or the Ordinance as a whole. The Court further finds that Marshall's intent was to review all relevant items in the site plan review process and merely left this open-ended category in case an item of an unanticipated type

43

appeared to be relevant in a particular situation.  The Court believes that Marshall would rather

have the Ordinance and its site plan review provision in place without the second part of Article

XVIII-A, § 6, ¶ 5 than to have the entire Ordinance stricken.  Accordingly, the Court will declare

invalid, strike and enjoin the enforcement of the following language from Article XVIII-A, § 6, ¶

5 of the Ordinance:  "and/or any other items required by the zoning officer."

In the absence of this provision, the Court finds that the site plan review process does not

amount to an unconstitutional prior restraint that renders unavailable the otherwise available

alternative sites for an adult bookstore in and around Marshall.

### III.   CONCLUSION

For the foregoing reasons, the Court **DECLARES** that the following language from

Article XVIII-A, § 6, ¶ 5 of the Ordinance violates the First and Fourteenth Amendments:

"and/or any other items required by the zoning officer."  The Court **ENJOINS** Marshall from

enforcing that provision of the Ordinance.  The remainder of the ordinance is constitutionally

sound, and the Court **DIRECTS** the Clerk of Court to enter judgment accordingly.  ION's

motion for a preliminary injunction (Doc. 6) is rendered **MOOT** by this order.

**IT IS SO ORDERED.**
**DATED:  February 22, 2006**

s/ J. Phil Gilbert
**J. PHIL GILBERT**
**DISTRICT JUDGE**

44